Okay, Home Federal, is that right? Yes. Counsel, you're up first. This is a case where a bank decided to lend money to a developer for the purpose of 20 projects and in the process found that at the conclusion of these projects, after the first 10, there wasn't enough money for them to complete all the projects. Abstracts & Titles was a title company that was used since 1994 by Home Federal as an escrow agent and they had a practice of doing business. In this case, there were 20 separate escrow agreements for each of these projects. The parties had conducted business enough that after a while they had a habit of not requiring progress affidavits, which is, in the writing, is an escrow agreement. And they were successful, those first 10 projects. This developer, a prime developer, was a borrower that Home Federal picked. I mean, they decided to lend money to him. They checked out the projects. They had a chance to investigate whether they wanted to invest in those projects in the form of lending money to this developer. So when it came time to pay out those first 10 projects, they followed the same pattern. There wasn't progress affidavits, but there was no allegation that there was a payment for something that wasn't done by Abstracts & Titles. The problem came in after those 10. There's no allegation? Okay, so you're talking about the earlier ones. Yes, the second 10 is where the problem comes in and that's why we're here. Because the complaint is that these projects weren't complete. Nobody's disputing that. The fact that Home Federal determined to lend a certain amount of money for a project didn't mean that that project was going to be completed. In fact, it was underfunded. And there's no claim here that Abstracts & Titles kept money or did things that were inappropriate with regard to how they handled the money personally. They paid out on claims. They paid out on work that was done. The claim is that after it's determined that this is underfunded, Home Federal decided to stick their head in the sand and act like they didn't know the guy they were dealing with. They didn't know the crime development and they didn't know what was going on. In fact, they did know that there was a problem with it. They knew it before the completion of the 10 because they had to lend another $30,000 directly outside the escrow agent to the developer. So we have a situation where these houses are not completed and they want to blame Abstracts & Titles as the escrow agent. The problem is this, and it's two-foot-one, is that there's nothing in there to show a connection or causal relationship or approximate cause of the damages that they're claiming in what Abstracts & Titles did or did not do. They paid for work that was done. You can't say that but for the escrow agent failing to follow the escrow agreement, they wouldn't have had these losses? Yeah, I agree. I think you can say that. You can't say it wasn't their fault. You can say that it would have happened anyway because it was underfunded as a project. And even the escrow agreement acknowledges that Abstracts & Titles – But if the escrow agent, Abstracts & Titles, had followed the escrow agreement, they wouldn't have paid out some of this money, true? Maybe. Here's why. Because what they're supposed to be given is a progress affidavit. And that's really what they weren't getting. They were getting progress affidavits. But what does that matter if, in fact, the work actually was done that they paid out? The problem is, at a certain point, the project was funded so that it never would have been completed with the amount of money that they had. Well, they should have never paid out all the money before a project was completed, right? Well, they were supposed to hold back 10% at least. And in all 10 of these, they paid it all out when they weren't completed. Correct. And what happened – that's true, they did. But that's not the damages that are here. As a matter of fact, what does it really change on the project? Even if they didn't pay it out, they're still incomplete houses. They're still houses that were underfunded to begin with. And, in fact, in the escrow agreement, it says that abstracts and titles and no one associated with those – they don't ensure that either the building will be completed or that the mortgage funds are sufficient to pay the cost to complete. And that's what they said. That's what the home federal said. They knew that they're not going to ensure the architectural integrity of that building or that it's going to be complete. Because they have nothing to do with the funding. But they're supposed to protect those funds. That was their job, to see that funds were only paid out in the manner described in the escrow agreement. And they didn't do that. And home federal lost money. Well, the next step of analysis is even if they kept the money, home federal would have lost money. Because they decided to underfund a project. So what they would have had may have been 10 percent. But they still would have had a building that was 10 percent less complete. So their damages were created by their actions in lending to someone who either, A, misrepresented the cost of completion, or, B, they knew it and lended the money to them anyway. Whether they paid every penny out or whether they paid back 10 percent, those buildings would have never been complete and they would have been 10 percent less complete. They would have still been a loss. And it has no direct relationship to the damages that the court awarded. So I agree with Your Honor that if they followed it by the letter, but also that hadn't been the practice between the two of them, that was raised at trial. But if they followed the letter, it wouldn't have made a difference. Because there still were unfinished buildings that were there that would have cost money. And so that really gets to the first part, which is the approximate cost, and that's the manifest weight standard that we have to meet. The second part is the jury demand, and that's what we believe is a de novo review because it's one in which it comes in as an interpretation of law by Judge Stobbs. As a practical matter, what we have is a 20-count complaint, sounding in law, that said you breached the contract, you owe us money. What happened at a certain point in the jury demands, when Home Federal dismissed the 20-count complaint, replaced it with a count saying this is really a breach of a fiduciary relationship, they really didn't change the nature of controversy because they're seeking money damages, and money damages is a remedy of law. Money damages is an adequate remedy of law. And just because they changed the name as a tactical decision, or in some of the cases, case law suggests it's a ruse to get out of dealing with the jury, it doesn't change the nature of the controversy. The nature of the controversy isn't an accounting. It isn't a convert or an instructive trust. It is money. And we know that you can have a jury in a money situation because we've got jury instructions for it. I mean, jury instructions prepared for exactly that. Now, those are used in broker cases where the real estate brokers, but it's clear a breach of fiduciary duty can be heard as a jury issue. And beyond that, if we look at – and this goes way back and causes us to review constitutional law and interpretation of common law going back to England. But, by the way, the reference on that fiduciary status and duty of loyalty to the client, that's just jury instruction 32.10. It was referenced in the index. It's an attachment to – at 8195. And there's another jury instruction after that. But if we go back and follow it, what is the underlying cause? The underlying cause is money damage. It's something that's perfectly – the jury's perfectly capable of hearing. And to strike it was, I think, error on the trial court's part because it prevented my client from having a right to a jury trial that's protected by the settlement. Those are the two points. Are there any questions? Thank you, counsel. Thank you. Counsel. May it please the court. Mr. Fairenkamp, David Angioli representing the Plaintiff Home Federal Savings and Loan Association College. Let me begin by addressing the jury issue. That's the issue that I find most interesting because as a former history major, it's like a trip down memory lane. The reason being that this is a situation where the legal analysis is identical to an historical analysis. The test of the right to jury trial depends on whether or not the plaintiff, had he filed this suit back in 1818 when the first Illinois Constitution was adopted, would have gone to an equity court or a law court. If the claim is such that the plaintiff would have headed into equity, then there is no right to jury trial. Now, opposing counsel focuses strictly on the nature of relief. He says, well, courts of law granted compensation. Home Federal is looking for compensation in this case. So, therefore, Home Federal would have gone to a court of law, not the Chancery Court. But what that argument ignores is that there is an entirely separate branch of equity. A branch of equity that does not depend on the nature of the relief requested, but instead whether or not an equitable right is involved. And in that branch of equity, the courts of Chancery had exclusive jurisdictions, irrespective of what relief the plaintiff sought. The classic example is breach of trust. If a beneficiary of a trust was aggrieved by the actions of the trustee, the court of equity had original and exclusive jurisdiction to grant relief. And that relief could be strictly in the form of compensation, giving the beneficiary an amount of money that equaled what the trustee should have given him in the first place or what the trustee improperly misappropriated. In other words, breach of fiduciary duty. That is exactly the cause of action that Home Federal pursued in this case. And that is the cause of action which, at the British Common Law in 1818, was one which courts of equity had original and exclusive jurisdiction to hear. Now, why do I say this is an action for breach of fiduciary duty? Because it is an action by the depositor against an escrow agent. We have laid out the case law in our briefs that is uniform and consistent. And it holds that the escrow agent stands in the same relation to the depositor as the trustee of a trust stands to the beneficiary. Breach of fiduciary duty is, or the depositor has a cause of action for breach of fiduciary duty if the escrow agent fails to comply strictly with the terms of the escrow instructions. It's the same as a beneficiary claiming breach of fiduciary duty against a trustee. There's no question about that. Now, I would invite the court's attention to the case law on this. Don't take my word of the historical analysis. Please take a look at the three recent Illinois Appellate Court cases that we have cited in our brief. And I think the most instructive one is the Boris versus Bank 1NA. It goes through the history and holds in spades that a cause of action for compensation, strictly compensation, for breach of fiduciary duty is purely equitable in nature. No right to jury trial attaches. After the Boris case, the Appellate Court for the First District decided the Post Romas case, which was an investor suing a stockbroker for breach of fiduciary duty, claiming that he was entitled to compensation equal to what the stockbroker profited off some transaction. Again, no right to jury trial. Where the plaintiff is seeking compensation as a result of breach of fiduciary duty, it is an equitable cause of action and no right to jury trial attaches. And then more recently in the Walensky case, which was decided by the First District within the last year, same situation. A condo unit owner sues the board of directors of the condominium association for damages for breach of fiduciary duty. She wants compensation for what she lost because the condo association improperly exercised or denied a right of first refusal. Appellate Court says no right to jury trial. The fact that we're seeking compensation as opposed to an injunction or specific performance is irrelevant because the nature of our claim is breach of fiduciary duty. Now, counsel suggests that because Home Federal may have had other remedies, we're stuck with our legal remedies. We cannot pursue our equitable remedies. That is not the law. I would invite the Court's attention to the Toro Petroleum case cited in our brief. It's, again, a cause of action by the depositor against an escrow agent. And the Court recognized that the plaintiff had two concurrent causes of action. One, for breach of contract or violation of the terms of the escrow agreement. But secondly and independently, a cause of action for breach of fiduciary duty. It's the plaintiff's choice as to what theory of recovery he will pursue. The plaintiff is the master of his claim. And the fact that we have concurrent remedies does not prevent me from seeking one and foregoing the other. So in sum, Your Honors, this is a purely equitable cause of action for breach of fiduciary duty. It is a cause of action that would have been tried in the course of Chancery under the British Common Law when our Constitution was adopted in Illinois in 1818, and therefore no right to jury trial contagious. Let me turn to the issue of causation. And in doing that, I think it is important for the Court to bear in mind the context in which this case comes up. Counsel says, well, the evidence says that Home Federal knew this or knew that. But, Your Honors, there is no appeal from the issue of liability. The defendant raised all of these affirmative defenses of, oh, well, we knew what was going on, and we waived our rights, or we are a stop, or we were contributory negligent. The trial court found against the defendant on all of those affirmative defenses. There is no appeal on the issue of liability. So when counsel says we didn't prove our case with respect to this course of dealing that he relies on, that's not an issue before this Court. The only issue before this Court is whether we have sufficient evidence of proximate cause. Proximate cause, of course, is an issue of fact. The trial court found that there was sufficient evidence of causation. This clause, of course, should affirm unless there is no evidence to support that. But the evidence is just the opposite. The evidence is overwhelming that but for the escrow agent's failure to comply with the terms of the escrow agreements, not a penny of these loan proceeds would ever have been dispersed. Now, the escrow instructions in this case didn't just say affidavits. They had five separate conditions. Number one, don't disperse anything without retaining 10% retainment. Number two, don't disperse anything unless you have an initial contractor's affidavit setting forth all the projected costs. Number three, don't disperse anything unless you've got a second affidavit, a draw affidavit, saying that all the work for which payment is being sought has been provided. And number four, probably most importantly, don't pay out any funds to this contractor unless, based on the contractor's cost projections, there is going to be enough money left in the loan to complete the construction project. The evidence shows, and this is not appeal, the evidence shows that the escrow agent didn't satisfy any one of those conditions in the case of each and every draw. The evidence also shows that if my client had known that these conditions were not being met, that if Home Federal had known that the escrow agent was not going to comply, it would not have dispersed the first dime of loan proceeds. So the answer to your question, Justice Stewart, is yes, not a penny of this loan money would have ever been dispersed but for the fact that the escrow agent had not complied with its duties, its fiduciary duty to Home Federal. The evidence, as I understand it, was that the escrow agent never required any of these requirements. Correct. There was never the initial affidavit. There was never an affidavit of completion. They didn't retain 10 percent on any of it. None of it. Correct. Is that right? Correct. And they never kept the loan in balance. There was one other condition to these escrow agents' agreements, and that's inspections. And the evidence was that sometimes they made an inspection. So of the five requirements, they partially satisfied one on some occasions, and they satisfied none of the others on the remaining occasions. Now, we've cited a case in our brief that's, I think, very instructive on this causation issue. It's a case out of the Northern District of Illinois where a lender deposits money with escrow agent, escrow agent disperses it to an imposter based on fraudulent closing documents. Of course, the lender seeks recovery from the escrow agent for breach of fiduciary duty. The question is proximate cause. And the court said, of course there's proximate cause because the lender has an affidavit here that says, I wouldn't have loaned this money, I wouldn't have given this money out or deposited it to the escrow agent if I thought the escrow agent wasn't going to comply with his duties under the escrow agreement. So the fact that these houses were incomplete or the loan amounts were insufficient, even if that were true, is irrelevant because none of these, they wouldn't have dug the first spade on any of these jobs because none of the money would have been dispersed. And if none of the money is dispersed, it's still in my client's office. And what you're claiming throughout the suit is to get the money back. Correct. Nothing more than that. Correct. No other consequential damages, just the money that was put in. You want that back. Exactly. And that leads me to the cross-appeal. Because although the court made a valiant effort to estimate the amount of home federals lost. You won like $620,000. Correct. But the trial judge had $400,000. Right. There's a problem there. And this is the, herein lies the problem, Your Honor. The trial court did not want to overcompensate home federal. So the trial court wanted to give an offset against the amount of money that was wrongfully dispersed to reflect the value of the completed work, the work that was paid for. Else we would have a windfall situation for home federal. Because we would have our collateral that represents some value plus everything that was dispersed. But what the trial court overlooked is that's not what we were seeking. We were seeking, yes, we want all the money that was wrongfully dispersed. But you should allow a credit for the amount that we recovered when we liquidated the collateral. That way you don't have to estimate what the value of the work is. We know what the value of the work was because that's what we derived when we sold the collateral. And the collateral had all been sold by the time of trial. Correct. Now, there was no need for the trial court to make that estimate unless there was some question as to whether or not our recovery from liquidation of the collateral was, you know, unreasonably low. But the evidence was undisputed in this case. One expert testified for the plaintiff that all the houses, all the collateral was sold in a commercially reasonable fashion, that the recovery represented a fair market value of the collateral. So there's no reason to suspect overcompensation. That being the case, we would ask the court, and the standard of review is somewhat ambiguous here. Typically, an award of damages is reviewed on a manifest way to the evidence standard. But there is a qualification there, and that qualification is did the trial court err in terms of the right measure of recovery or did he evaluate the evidence in a way differently than the appellate court would have? If it's the former, if the question is whether the right measure of damages was applied, then the appellate court doesn't have to defer to the trial court's ruling. And in this case, the evidence is undisputed. All of this money was paid out in violation of the escrow agreement in breach of the defendant's fiduciary duty. We recovered some of the money through commercially reasonable sales. Therefore, that's our loss. So we would ask the court to modify the judgment to include the full measure of recovery. Finally, we're, in our cross-appeal, asking for an award of prejudgment interest. Again, that is a question that is vested in the trial court's discretion. In an equity case, the court has the authority or the power to award prejudgment interest but doesn't have to. It's discretionary. Now, the reason that this court should inject itself into that determination is because Judge Dobbs, perhaps due to the fault of counsel, overlooked the question of prejudgment interest. It was prayed for in our complaint, but if you scrutinize Judge Dobbs' judgment, he doesn't address the question. So it's not clear whether or not he exercised his discretion at all with respect to prejudgment interest. Now, the evidence in this case seems to me overwhelming that prejudgment interest is appropriate. First of all, we're talking about a situation where Home Federal has been deprived of its funds for about six years prior to the date of judgment. The last funds were dispersed from these escrow agreements wrongfully in the fall of 2006. The case was tried and judgment was entered in 2012. So to not give a lender, someone who is in the business of loaning funds and recovering interest, prejudgment interest after a six-year hiatus in the use of his funds seems to me to mandate an award of prejudgment interest as a matter of equity. But in addition, the court can also, in determining whether it's equitable to award prejudgment interest, look at the conduct of the defendant. Has the defendant been guilty of inequitable conduct? And in this case, the evidence of that inequitable conduct is overwhelming. The president of the defendant escrow agent testified that she never intended to perform her obligations under any of these escrow agreements before she even signed them. She testified that before she undertook her job as escrow agent, she thought the borrower and the contractor were crooks. She acknowledged that before she undertook her obligations under any of these escrow instructions, she thought that all of these contractors' and borrowers' cost estimates were fraudulent. This is a situation where the fiduciary, the escrow agent, is guilty of extreme and egregious conduct. And for those reasons, we ask that the court affirm the judgment to the extent of the award, but also modify to include the proper measure of damages and prejudgment. Thank you very much, Your Honor. Counsel? Thank you. Could you deal with that issue about the five conditions to be satisfied before any funds entrusted by HOME were released? I believe that she testified at trial that she did not satisfy those conditions, that it had been a practice between HOME Federal, because they've been doing business since 1994, and the title company, that they would practice in a way that wasn't by the letter of it. I think that was not in dispute. I think she agreed that way. But they also knew what they were dealing with, and they talked regularly. There was a representative from HOME Federal who was the person who was in regular contact and knew what was going on, and they talked to her regularly. She, in fact, there was no complaint about it in those first ten projects. None. And there wasn't a complaint before. What had been going on is that since 1994, these two entities, the bank and the title company, had been doing business without a problem. And they had never referenced it or had to reference this, and she acted, the title company acted in a way that was consistent with their pattern and practice. But their sides were crooks? Not HOME Federal. I should say HOME Federal. Right. The builders were crooks? Well, sure. Let me address that. HOME Federal didn't just fall off the turnip truck. They knew who they were dealing with. These were developers, and it was someone who had been in the business in that area for a while. So they knew who they were dealing with. They wanted to lend money. They wanted to make some money on this project, and they thought they could, and they took the risk, because they did the credit report. HOME Federal picked that developer, and they knew there were problems with them. And to act as though HOME Federal has blinders on, they just take people in and assume everybody's golden heart is ridiculous, and that's not the way they operate. They know it. Well, what does that have to do with the duties of the escrow agent? I mean, knowing all that, shouldn't they have been even more vigilant? I mean, if you're saying, we think these guys are crooks, they're fraudulent, but I'm going to take on the duty of making sure they do what they're supposed to do. If you take it on, you take it on, don't you? If you take on that responsibility, then you have an obligation to perform the responsibility. But what they were doing is performing in the way that had been their practice, and that was they would talk, they would contact, and it was regular contact, and there was no dispute that there was regular. Well, there was some dispute. There was one witness that disputed that. But that's the way they had done business, and it had worked. And when it worked, there wasn't any problem. And it was with the same developer. So the fact that the president of the title company expressed concern about this person was not something that was unknown. I mean, not unknown in the community and not known to the bank. There was a choice, though, wasn't there? She could have said, you know, I know these guys, they're crooks. I'm not taking this on. But instead, they signed the agreement, and the agreement has these provisions in it that require certain things be done. Sure, and what happens is that becomes like a little pool of trust between the lender and the title company they've been dealing with because they knew there were problems. You know, to say that they wouldn't distribute a penny is just ridiculous because they distributed more money on one transaction in 2005 to them with $30,000 when they didn't complete a project. They didn't go through. The title company is an escrow agent. They just did it. So red lights go on there, too. And it's one thing to say, we just didn't know. Gosh, we're just naive in this world of lending. We don't know these people. That's just not the truth. The truth is they knew there was a problem themselves. And to say we don't have to be vigilant ourselves because we're going to blame it on abstracts and titles misses the point. Everybody should have been vigilant with this guy. But there was success in the first ten projects. And when there's success, people want to continue doing it. And when there's failure, then they want to look at people. You know, success has many parents, but failure has an orphan. I probably misstated, but that's the point. You know, they want to start pointing fingers, but they were up to their elbows. And the fact now to say, you know, we're innocents in this world. They're not innocents. And they knew what they were doing. Any other questions? Thank you. Thank you, fellas.